FILED
2025 Jan-22 PM 04:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>61-CV-2023-900112.00 |
| --- | --- | --- |

### IN THE CIRCUIT COURT OF TALLADEGA COUNTY, ALABAMA
### SHELBY COUNTY, ALABAMA ET AL V. 3M COMPANY ET AL

**NOTICE TO:** 3M COMPANY, CORPORATION SERVICE COMP 641 SOUTH LAWRENCE ST, MONTGOMERY, AL 36104

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S),
JEFFREY DONALD PRICE

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: P.O. Box 4160, MONTGOMERY, AL 36103

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of SHELBY COUNTY, ALABAMA
pursuant to the Alabama Rules of the Civil Procedure.       *[Name(s)]*

| 04/10/2023 | /s/ BRIAN YORK | By: |
| --- | --- | --- |
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.    /s/ JEFFREY DONALD PRICE

*(Plaintiff's/Attorney's Signature)*

## RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____ .

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

*(Name of Person Served)*        *(Name of County)*

Alabama on _____ .

*(Date)*

_____        _____
*(Type of Process Server)*        *(Server's Signature)*

*(Address of Server)*

_____        _____
*(Server's Printed Name)*        *(Phone Number of Server)*

ELECTRONICALLY FILED
4/10/2023 6:17 PM
61-CV-2023-900112.00
CIRCUIT COURT OF
TALLADEGA COUNTY, ALABAMA
BRIAN YORK, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93    Rev. 9/18 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case: 61<br><br>Date of Filing:<br>04/10/2023 | Judge Code: |

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF TALLADEGA COUNTY, ALABAMA
### SHELBY COUNTY, ALABAMA ET AL v. 3M COMPANY ET AL

**First Plaintiff:** ☐ Business  ☐ Individual   **First Defendant:** ☑ Business  ☐ Individual
☐ Government  ☑ Other                          ☐ Government  ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☐ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
- ☐ TOPE - Personal Property
- ☑ TORE - Real Property

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/<br>Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/<br>Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ EPFA - Elder Protection From Abuse
- ☐ QTLB - Quiet Title Land Bank
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☑ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**  F ☑ INITIAL FILING    A ☐ APPEAL FROM<br>DISTRICT COURT    O ☐ OTHER

R ☐ REMANDED    T ☐ TRANSFERRED FROM<br>OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?** ☑ YES ☐ NO   Note: Checking "Yes" does not constitute a demand for a<br>jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:** ☑ MONETARY AWARD REQUESTED ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**

PRI086 | 4/10/2023 6:17:10 PM<br>Date | /s/ JEFFREY DONALD PRICE<br>Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:** ☐ YES ☑ NO ☐ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:** ☐ YES ☐ NO

ELECTRONICALLY FILED
4/10/2023 6:17 PM
61-CV-2023-900112.00
CIRCUIT COURT OF
TALLADEGA COUNTY, ALABAMA
BRIAN YORK, CLERK

# IN THE CIRCUIT COURT OF TALLADEGA COUNTY, ALABAMA

| | |
|---|---|
| SHELBY COUNTY, ALABAMA;<br>TALLADEGA COUNTY, ALABAMA | )<br>)<br>)<br>) |
| **Plaintiff,** | )<br>) |
| **v.** | )<br>)  **CIVIL ACTION NO:** |
| 3M COMPANY; ALADDIN<br>MANUFACTURING CORPORATION;<br>ALADDIN MANUFACTURING<br>CORPORATION OF ALABAMA,<br>LLC; AUTO CUSTOM CARPETS,<br>INC.; DAIKIN AMERICA, INC.; E.I.<br>DU PONT DE NEMOURS AND<br>COMPANY; INV PERFORMANCE<br>SURFACES, LLC f/k/a INVISTA,<br>S.A.R.L., LLC; MOHAWK CARPET,<br>LLC;  MOHAWK INDUSTRIES, INC.;<br>SHAW INDUSTRIES, INC.; SHAW<br>INDUSTRUSTIES GROUP, INC.; THE<br>CHEMOURS COMPANY;  and<br>FICTITIOUS DEFENDANTS A-J, those<br>persons, corporations, partnerships or<br>entities who acted either as principal or<br>agent, for or in concert with the other<br>named Defendants and/or whose acts<br>caused or contributed to the damages<br>sustained by the Plaintiff, whose<br>identities are unknown to the Plaintiff,<br>but which will be substituted by<br>amendment when ascertained, | )<br>)  _____<br>)<br>)  ***TRIAL BY JURY REQUESTED***<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiffs, Shelby County, Alabama and Talladega County, Alabama bring this Complaint against Defendants 3M Company, Aladdin Manufacturing Corporation, Aladdin Manufacturing Corporation of Alabama, LLC, Auto Custom Carpets, Inc., Daikin America, Inc., E.I. du Pont de Nemours and Company, Invista, S.A.R.L., LLC, Mohawk Carpet LLC, Mohawk Industries, Inc., Shaw Industries, Inc., Shaw Industries Group, Inc., The Chemours Company, ("Defendants"), and allege as follows:

### STATEMENT OF THE CASE

1.     Plaintiffs, Shelby County, Alabama and Talladega County, Alabama ("Plaintiffs") have and continue to be damaged due to the negligent, willful, and wanton conduct of the Named and Fictitious Defendants, as well as the nuisance and trespass caused by the Defendants' past and present release of toxic chemicals, including per- and poly-fluoroalkyl substances ("PFAS") (other than Aqueous Film Forming Foam) and related chemicals from manufacturing facilities in and around the City of Dalton, Georgia.

2.     Shelby County provides drinking water directly to its own residential and commercial customers in Shelby County. Shelby County utilizes the Coosa River as its raw water source.

3.     Talladega County provides drinking water directly to its own residential and commercial customers in Talladega County. Talladega County utilizes the Coosa River as its raw water source.

4.     Shelby and Talladega Counties co-own and operate the Talladega-Shelby Water Treatment Plant in Talladega County.

5.      Shelby County also owns and operates an additional facility known as South Water Treatment Plant in Shelby County.

6.      Named and Fictitious Defendants operate or supply chemical products and materials to manufacturing facilities located upstream of Plaintiffs' water intake sites, in or near the City of Dalton, Georgia. Named and Fictitious Defendants use chemical compounds that contain or degrade into PFAS at their facilities to impart water, stain, and grease resistance to their carpet, textile, and flooring products. Industrial wastewater released to the Dalton Utilities public sewer from Named and Fictitious Defendants' manufacturing plants contain high levels of PFAS. These chemicals resist degradation during processing at Dalton Utilities' wastewater treatment center and contaminate the Conasauga River.

7.      The PFAS sent to Dalton Utilities and other wastewater treatment facilities by the Defendants cannot be treated and removed from the environment by Dalton Utilities prior to migrating to the Conasauga River.  The Conasauga River is one of the Coosa River's five major tributaries.

8.      Defendants' solid waste also produces PFAS wastewater in the form of landfill leachate from the Dalton-Whitfield Solid Waste Authority's Old Dixie Landfill which sends its landfill leachate to the Dalton Utilities' public sewer.

9.      Defendants' manufacturing facilities also release PFAS directly into the environment through wastewater, air emissions, and stormwater.

10.     For decades, the only known disposal method that destroys PFAS was high temperature incineration.

3

11. Named and Fictitious Defendants' PFAS (other than Aqueous Film Forming Foams) have contaminated the water in the Coosa River at Plaintiffs' intake sites, and the chemicals cannot be removed by the water treatment processes Plaintiffs currently utilizes.

12. As a direct and proximate result of Named and Fictitious Defendants' contamination of the Plaintiffs' raw water source, Plaintiffs have suffered substantial economic and consequential damage, including, but not limited to, expenses associated with the future installation and operation of a filtration system capable of removing PFAS from the water; expenses associated with the removal or remediation of contaminated property; expenses incurred to monitor PFAS contamination levels; and lost profits and sales.

13. Wherefore, Plaintiffs seek compensatory and punitive damages to the fullest extent allowed by award from a jury. Plaintiffs also seek equitable and injunctive relief compelling the Named and Fictitious Defendants to remediate their contamination and prevent additional releases of PFAS and other toxic chemicals into Plaintiffs' raw water source.

**JURISDICTION**

14. Jurisdiction is proper in this Court pursuant to Ala. Code §12-11-30(1) (1975), as Plaintiffs' claims exceed $20,000.

15. Plaintiffs bring this action pursuant to Ala. Code § 11-3A-2(a)(5).

16. Plaintiffs assert no federal cause of action in this Complaint.

17. Venue is proper in this Court pursuant to Ala. Code § 6-3-7(a)(1), as a substantial part of the events giving rise to the claims occurred in Talladega County. Venue is also proper in this Court pursuant to Ala. Code § 6-3-7(b), as Plaintiffs assert a right to relief jointly, severally, and arising out of the same transaction or occurrence. There exists a substantial number of common questions of law or material fact that will arise in the action that 1) will predominate over

4

individualized questions pertaining to each plaintiff, 2) the action can be maintained more efficiently and economically for all parties than if prosecuted separately; and 3) that the interest of justice supports the joinder of the parties as plaintiffs in one action. Joinder, and thus venue in this Court, is appropriate, as Plaintiffs are co-owners and co-operate water treatment facilities in Talladega County.

18.     The Defendants' wrongful acts which form the basis of this Complaint, including the ongoing and continuing trespass and the creation of an ongoing and continuing nuisance, occurred in Talladega County and injured Plaintiffs in Talladega County within the applicable statutes of limitations and /or have caused ongoing and continuing damages suffered by Plaintiffs within the applicable statutes of limitations.

## PARTIES

19.     Plaintiff Shelby County is a body corporate with the power to sue or be sued in any court of record. Ala. Code §11-1-2. Plaintiff is responsible for the public health, safety, and welfare of its citizens and brings this action pursuant to Ala. Code § 11-3A-2(a)(5).

20.     Plaintiff Talladega County is a body corporate with the power to sue or be sued in any court of record. Ala. Code §11-1-2. Plaintiff is responsible for the public health, safety, and welfare of its citizens and brings this action pursuant to Ala. Code § 11-3A-2(a)(5).

21.     Shelby County and Talladega County join in this action pursuant to Ala. R. Civ. P. 20(a).

22.     Defendant 3M Company ("3M") is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Shelby County and Talladega County.  Among other acts and omissions, Defendant 3M has for many years manufactured and supplied PFAS to one or more of the Defendants in this action. 3M continues to manufacture PFAS.

5

23.     Defendant Aladdin Manufacturing Corporation is a foreign corporation qualified to do business in Alabama and is causing injury in Shelby County and Talladega County. Aladdin Manufacturing Corporation is the owner and operator of multiple facilities that manufacture carpet and various floor products, including the Mohawk mills–which have released industrial wastewater containing PFAS into the Dalton Utilities sewer and directly into the environment.

24.     Defendant Aladdin Manufacturing Corporation of Alabama, LLC is a domestic limited liability company with its principal place of business in Bridgeport, Alabama, and is causing injury in Shelby County and Talladega County. Aladdin Manufacturing Corporation of Alabama, LLC manufactures and produces certain nylon fibers, resins, and finished yarns essential for manufacturing carpet. Aladdin Manufacturing Corporation of Alabama, LLC shipped these materials to mills in and around Dalton, Georgia.

25.     Defendant Mohawk Carpet, LLC, is a foreign limited liability company causing injury in Shelby County and Talladega County. Defendant Mohawk Carpet, LLC is the owner and operator of multiple floor covering and carpet manufacturing facilities located in and around Dalton, Georgia, which have released industrial wastewater containing PFAS into the Dalton Utilities sewer.

26.     Defendant Mohawk Industries, Inc., is a foreign corporation causing injury in Shelby and Talladega counties. Defendant Mohawk Industries, Inc. is the owner and operator of multiple floor covering and carpet manufacturing facilities located in and around Dalton, Georgia, which have released industrial wastewater containing PFAS into the Dalton Utilities sewer.

27.     Defendants Mohawk Carpet, LLC, Mohawk Industries, Inc., Aladdin Manufacturing Corporation, and Aladdin Manufacturing Corporation of Alabama, LLC will hereinafter be referred to collectively as "Mohawk."

28.    Defendant Auto Custom Carpets, Inc. ("Auto Custom Carpets") is a domestic corporation with its principal place of business in Anniston, Alabama and is causing injury in Shelby County and Talladega County. Auto Custom Carpets manufactures automotive flooring and carpets from a production facility in Lafayette, Georgia that borders the Chattooga River, and in Oxford, Alabama in the Coosa watershed. The Chattooga River is a tributary of the Coosa River known to contain PFAS.

29.    Defendant Daikin America, Inc. ("Daikin") is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Shelby County and Talladega County. Defendant Daikin has for many years manufactured and supplied PFAS to one or more of the Defendants in this action, including, but not limited to, Defendant Shaw Industries.

30.    Defendant E.I. du Pont de Nemours and Company is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Shelby County and Talladega County. Among other acts and omissions, Defendant E.I. du Pont de Nemours and Company has manufactured and supplied PFAS to one or more of the Defendants in this action.

31.    Defendant The Chemours Company ("Chemours"), a spin-off of E.I. du Pont de Nemours and Company, is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Shelby County and Talladega County. Among other acts and omissions, Defendant Chemours has manufactured and supplied PFAS to one or more of the Defendants in this action. Upon information and belief, Chemours "remains committed" to fluorine (also known as PFAS) chemistry and continues to make and sell PFAS.

32.    Defendants E.I. du Pont de Nemours and Company and the Chemours Company shall hereinafter be referred to collectively as "DuPont."

7

33.     Defendant Invista S.A.R.L, LLC ("Invista") is a foreign limited liability company qualified to do business in the State of Alabama and is causing injury in Shelby and Talladega counties. Defendant Invista has for many years manufactured and supplied PFAS to one or more of the Defendants in this action.

34.     Defendant Shaw Industries, Inc., is a foreign corporation and a wholly owned subsidiary of Shaw Industries Group, Inc. and is qualified to do business in the State of Alabama and is causing injury in Shelby County and Talladega County. Defendant Shaw Industries, Inc. is the owner and operator of multiple facilities located in and around Dalton, Georgia, which manufacture, coat, and dye carpets, rugs, and other soft surface products and which have released industrial wastewater containing PFAS into the Dalton Utilities sewer.

35.     Defendant Shaw Industries Group, Inc., is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Shelby County and Talladega County. Defendant Shaw Industries Group, Inc. is the owner and operator of multiple facilities located in and around Dalton, Georgia, which manufacture, coat, and dye carpets, rugs, and other soft surface products and which have released industrial wastewater containing PFAS into the Dalton Utilities sewer.

36.     Defendants Shaw Industries, Inc., and Shaw Industries Group, Inc., shall hereinafter be collectively referred to as "Shaw."

37.     Fictitious Defendants A, B, C, D, E, F, G, H, I, & J are those persons, corporations, partnerships, or entities who released PFAS and their precursor compounds, including, but not limited to PFOA, PFOS and related chemicals into the water supply upstream of Shelby and Talladega Counties' water intake sites, who acted either as principal or agent, for or in concert with the named Defendants, and/or who acts caused or contributed to the damages sustained by

the Plaintiffs, whose identities are unknown to Plaintiffs, but which will be substituted by amendment when ascertained.

## FACTUAL ALLEGATIONS

38.     The City of Dalton, Georgia, is known as the carpet capital of the world and there are over 100 carpet manufacturing plants in Dalton and the surrounding communities. More than 90% of the world's carpet is produced within a 65-mile radius of Dalton. For decades, and despite warnings of the dangerous nature of PFAS, these carpet manufacturing plants have used PFAS (and other related chemicals) in the carpet and flooring manufacturing process.

39.     Defendants are owners and operators of, or the chemical and material suppliers to, carpet manufacturing facilities in and around Dalton, Georgia, which use various PFAS and PFAS containing products in the manufacturing process.

40.     Defendants have in the past and continue to release PFAS, their precursors, and related chemicals directly into abutting rivers, in their industrial wastewater, and through leachate generated from solid waste, which is then treated by Dalton Utilities and other wastewater treatment plants, including but not limited to the Loopers Bend Wastewater Treatment Plant in Dalton, Georgia, before being sprayed across a 9,800-acre Land Application System ("LAS").

41.     PFAS have been detected in dangerous and high levels in the soil, wastewater, effluent, groundwater, sewage sludge, biosolids and compost at the Loopers Bend Wastewater Treatment Plant, which borders the Conasauga River.

42.     Defendants 3M, DuPont, Daikin, and Invista, ("Manufacturing Defendants") manufacture, supply, and sell PFAS and products that contain PFAS which are used in carpet and flooring manufacturing.

9

43.    Defendants Mohawk, Shaw, and Auto Custom Carpets, Inc., ("Carpet Defendants") have used and continue to use PFAS (as well as products that contain PFAS) in the carpet and flooring manufacturing process.

44.    PFAS are human-made, synthetic chemicals that do not exist naturally in the environment, are harmful at extremely low levels (in the parts per trillion (ppt), and were widely used for decades in consumer, household, and other commercial products, as well as industrial uses. PFAS are a class of nearly 12,000 individual compounds which includes PFOA and PFOS.

45.    Despite the existence of 12,000 individual compounds, current laboratory testing methods can only detect 29 individual PFAS compounds in drinking water.

46.    Defendants' PFAS and PFAS containing products are known to contain a number of PFAS impurities and precursors that current laboratory methods cannot yet detect in drinking water.

47.    PFAS and PFAS containing products are used to impart soil and stain resistance to carpet.

48.    Fiber lubricators used in the manufacture of nylon fibers and finished yarns are also known to contain PFAS that are then imparted on the fibers and yarns in the fiber manufacturing process.

49.    PFAS containing products such as wetting agents, defoamers, as well as yarn and fiber produced using certain fiber lubricators continue to be used by carpet mills in and around Dalton, Georgia.

50.    Various processes in carpet and flooring manufacturing generate wastewater that contains PFAS.

51.    PFAS resist degradation during the treatment process utilized by Dalton Utilities. PFAS increase in concentration as waste accumulates in the LAS. The LAS is bordered by the Conasauga River, and runoff and groundwater contaminated with PFAS from the LAS pollutes the river as it flows past the LAS.  Defendants have had knowledge for decades that their PFAS cannot be removed from the wastewater sent to Dalton Utilities or other treatment facilities which ultimately reach Talladega and Shelby Counties.

52.    In addition to releasing PFAS in industrial wastewater to Dalton Utilities and other wastewater treatment plants, Defendants have also released PFAS by way of emissions, leaks and spills into stormwater drains and sewers which feed into local creeks and streams.

53.    For example, in August of 2016 Mohawk impermissibly released 9,500 gallons of untreated process wastewater from its facility located on Hamilton Street in Dalton, Georgia into Drowning Bear Creek, a tributary to the Conasauga River. This release resulted in a fish kill and visible discoloration of Drowning Bear Creek for a mile downstream.

54.    In March of 2019, Mohawk released 600 gallons of a spin finish chemical into a stormwater drain, again impacting Drowning Bear Creek.

55.    In April 2013, a Shaw facility was the subject of a complaint to Georgia EPD that its facility was "dumping chemicals into the sewer."

56.    Defendants had knowledge that PFAS should not be released in wastewater to treatment facilities like Dalton Utilities or to stormwater systems which impact local creeks, streams, and tributaries to the Conasauga River.

57.    PFAS are not the subject of Defendants' industrial user permits to Dalton Utilities nor are PFAS regulated under the Dalton Utilities Land Application System (LAS) permit.

58.    Defendants expressly and directly aimed polluted wastewater from their plants not only at Dalton Utilities and the LAS in Georgia but also at Alabama through the continuing flow of the polluted wastewater from the Carpet Defendants' plants, into the Coosa River and its tributaries, and ultimately to Shelby and Talladega Counties.

59.    The United States Environmental Protection Agency ("EPA"), the University of Georgia ("UGA"), and the Georgia Environmental Protection Division ("EPD") have identified industrial wastewater from defendants' manufacturing facilities as the source of PFAS being applied to the LAS and entering the Conasauga River, the Oostanaula River, the Chatooga River, the Coosa River, and ultimately Shelby and Talladega Counties' water supply.

60.    Plaintiffs do not allege that contamination of drinking water sources occurred through Aqueous Film-Forming Foam.  Contamination found in the drinking water and drinking water sources of Plaintiffs includes PFAS not found in Aqueous Film-Forming Foam.

61.    The stable carbon-fluorine bonds that make PFAS so pervasive in industrial and consumer products also result in their environmental persistence, as there is no known environmental degradation mechanism for these chemicals. They are readily absorbed into biota and tend to accumulate with repeated exposure.  At least one PFAS, PFOS, crosses the placenta in humans, accumulates in amniotic fluid, and has been detected in the umbilical cord blood of babies.

62.    When humans ingest PFAS, these toxic chemicals bind to plasma proteins in the blood and are readily absorbed and distributed throughout the body. The liver and kidneys are important binding and processing sites for PFAS, resulting in physiological changes to these and other organs. Because of strong carbon-fluorine bonds, PFAS are stable to metabolic degradation, resistant to biotransformation, and have long half-lives in the body. These toxic chemicals

accumulate in the body over time and cause long-term physiologic alterations and damage to the blood, liver, kidneys, immune system, and other organs.

63.    The association of exposure to these chemicals and certain cancers have been reported by the C8 Health Project, an independent Science Panel charged with reviewing the evidence linking one PFAS, PFOA, to the risk of disease. The C8 Panel determined that kidney and testicular cancers have a "probable link" to PFOA exposure.  PFAS exposure has also been linked to immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. Epidemiological studies of workers exposed to PFOA support the association between PFOA exposure and kidney and testicular cancers. These studies also suggest associations between PFOA exposure and prostate and ovarian cancers and non-Hodgkin lymphoma. Rodent studies also support the link with cancer. The majority of a United States Environmental Protection Agency ("EPA") Science Advisory Board expert committee recommended in 2006 that PFOA be considered "likely to be carcinogenic to humans."

64.    In recent years, immunotoxicity of PFAS has been demonstrated in a wide variety of species and models, including humans. For instance, a study of ninety-nine Norwegian children at age three found that maternal serum PFOA concentrations were associated with decreased vaccine responses, especially toward rubella vaccine, and increased frequencies of common cold and gastroenteritis. The combined human and experimental evidence is in strong support of adverse effects on immune functions at relatively low exposure levels.

65.    In 2009, based on the science available at that time, EPA published provisional drinking water health advisories for short-term exposure (weeks to months) to PFOA and PFOS. The short-term health advisory for PFOA was 400 parts per trillion ("ppt"), or 0.4 parts per billion ("ppb").  The advisory for PFOS was 200 ppt, or 0.2 ppb.

66.     In 2006, the State of New Jersey adopted a drinking water health advisory for PFOA of 40 ppt (0.04 ppb), which is ten times lower than the 2009 EPA provisional drinking water health advisory for PFOA. In 2014, based on review of recent scientific studies, New Jersey proposed lowering the health advisory for PFOA even further to 20 ppt (0.02 ppb). Currently, the states of New York, California, New Jersey, Massachusetts, Vermont, New Hampshire, and Minnesota have all recommended and/or enacted PFAS health advisories lower than EPA advisories. On May 19, 2016, due to the evolution of the science surrounding the health effects associated with the consumption of PFOA and PFOS in drinking water, EPA published a lifetime Drinking Water Health Advisory of 70 ppt (0.07 ppb) for combined concentrations of PFOA and PFOS ("May 2016 EPA Health Advisory" or "Health Advisory limit").

67.     The May 2016 EPA Health Advisory was based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and was also informed by epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicate that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects.

68.     The May 2016 EPA Health Advisory stated that PFOA and PFOS have "extremely high" persistence in the environment and the human body, and that the developing fetus and newborn are "particularly sensitive" to PFOA and PFOS induced toxicity. The May 2016 EPA Health Advisory also stated that single exposure to a developmental toxin at a critical time can produce an adverse effect, and that short-term exposure to these chemicals can result in a body burden that persists for years and can increase with additional exposures.

69. The May 2016 EPA Health Advisory stated that, because PFOA and PFOS have similar adverse effects—including effects on the liver, neonatal development, responses to immune challenges, and association with tumors—when they co-occur in a drinking water source, the combined concentrations of PFOA and PFOS should be compared with the Health Advisory limit of 70 ppt (0.07 ppb) in order to offer the necessary margin of protection to all Americans with these chemicals in their drinking water.

70. On June 15, 2022, the EPA again lowered the 2016 Drinking Water Health Advisory to 0.004 ppt for PFOA and 0.02 ppt for PFOS. It also issued new drinking water health advisories for 10 ppt for GenX compounds and 2,000 ppt for PFBS.

71. While Defendants have long been aware of the persistence and toxicity of certain, Defendants have knowingly and intentionally released and continue to release these chemicals into the rivers and watersheds which supply drinking water to Shelby and Talladega Counties.

72. Defendants that manufacture PFAS have known for at least 40 years that certain PFAS persist in the environment and accumulate in the bodies of humans, fish, and test animals. For instance, blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas." The same study found that "laboratory workers, with former exposure, but none for 15–20 years, had elevated [organic fluorine levels] above literature normals." A 1979 3M study of fish caught by the Wheeler Dam in Alabama (26 miles downstream from the 3M plant in Decatur, Alabama) showed that the chemicals bioaccumulate in fish.

73. Defendants 3M and DuPont have long been aware of the persistence and toxicity of PFAS, yet they knowingly and intentionally continued to promote and sell these chemicals to the carpet and textile manufacturing industry. Blood tests of 3M workers conducted in 1978 found

elevated organic fluorine levels proportionate to the length of time the employees had spent in production areas. Furthermore, a 1979 3M study of the effects of fluorochemical compounds on Rhesus monkeys was terminated after only 20 days after every monkey, at every dosage level, died from exposure to the chemicals. It was not until 21 years later, in March 2000, that 3M told the public that a "new study" of the effects of these compounds on Rhesus monkeys was part of the reason 3M pulled one of its consumer products, Scotchgard, off the market. In 1983, a team of 3M toxicologists recommended broad testing regarding the effects of 3M's fluorochemicals on the environment and human beings.

74.    Defendant 3M has also known for at least 14 years that PFAS are not effectively treated by conventional wastewater treatment plant processes after finding high concentrations of these chemicals in samples taken from the effluent of a wastewater treatment plant located only a few miles downstream from one of its production facilities.

75.    In 1978, DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. Even though DuPont found that PFOA is "toxic," that "continued exposure is not tolerable," and discovered transplacental movement of PFOA to fetuses, it failed to disclose this to the public or to the EPA.

76.    In 1981, DuPont failed to disclose to the public and to the EPA data demonstrating the transplacental movement of PFOA to fetuses. It also failed to disclose to the public and to EPA widespread PFOA contamination in public drinking water sources resulting from releases at its Washington Works facility in Washington, West Virginia, where PFOA concentrations exceeded DuPont's own Community Exposure Guideline.

77.    In 1991, DuPont researchers recommended a follow-up study to a study from ten years earlier of employees who might have been exposed to PFOA. The earlier study showed

elevated liver enzymes in the blood of DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, DuPont chose not to conduct the follow-up study, instead postponing it until after it was sued.

78.    In or around December 2005, DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues."

79.    DuPont made those statements even though in 2006, its own Epidemiology Review Board advised the company not to make public statements asserting that PFOA does not pose any risk to health.

80.    For decades, 3M manufactured PFOA and supplied it to DuPont for its manufacture of Teflon and other products. In May 2000, 3M decided to stop producing PFOA. Despite DuPont's knowledge of the risks to human health posed by PFOA, in response to the withdrawal of 3M from the market, DuPont opened its own plant to manufacture PFOA to be incorporated into DuPont's products.

81.    In 2015, Dupont spun off its performance chemicals business (which included the design, manufacture, marketing, and sale of PFAS, as well as the environmental liabilities) to Chemours.

82.     Based on information and belief, all Defendants have long been aware of the persistence and toxicity of PFAS at least as a result of communications with Defendant manufacturers and users of these chemicals, as well as EPA, UGA and/or EPD.

83.     Based on information and belief, all Defendants knew or should have known that, in its intended and/or common use, PFAS would very likely injure and/or threaten public health and the environment, where this knowledge and information was accessible to all Defendants.

84.     Based on information and belief, all Defendants knew or should have known that PFAS are mobile and persistent, bioaccumulative, biomagnifying, and toxic. Despite this knowledge, Defendants concealed from the public and government agencies its knowledge of the risk of harm to the public posed by PFAS.

85.     In 2002, EPA took regulatory action under the Toxic Substances Control Act to limit the future manufacture of PFOA, PFOS, and related chemicals based on the persistence and toxicity of these chemicals. In response, Defendants undertook to develop and manufacture and supply to Defendants PFAS with six or fewer carbons, such as GenX, referred to as Short-Chain PFAS.

86.     Defendants are aware that, like PFOA and PFOS, these Short-Chain PFAS are also not subject to biodegradation, accumulate in human blood, and are known to cause cancer in animal studies.

87.     By at least the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, indicated that at least one type of PFAS—PFOA—had caused a triad of tumors (Leydig/testicular, liver, and pancreatic) in a chronic cancer study in rats. By the mid-2010s, Defendants 3M and Dupont/Chemours were aware that at least one Short-Chain PFAS had been found to cause the same triad of tumors in a

chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFAS.

88.    The Carpet Manufacturing Defendants have been aware for decades that PFAS in their wastewater should not be released to treatment facilities like Dalton Utilities and, despite this knowledge, the Defendants have released and/or continue to release PFAS contaminated water to Dalton Utilities.

89.    In addition, upon information and belief, the Carpet Manufacturing Defendants have sought to procure PFAS from foreign sources after 3M and DuPont ceased manufacturing and supply of PFOA and PFOS in the United States.

90.    In 2022, Talladega and Shelby Counties' testing for PFAS consistently found levels of PFOS and PFOA that exceed the 2022 EPA Health Advisory.  In addition, Shelby and Talladega Counties have found other PFAS in its water supply, including Short-Chain PFAS.

91.    Talladega and Shelby Counties' current water filtration systems are not designed for removing or reducing levels of PFAS.

92.    Due to the high levels of PFAS found in their water supply, Talladega and Shelby Counties have and will continue to incur additional expenses and lost profits.

93.    Due to the ongoing and continuing trespass, Plaintiffs have suffered and continue to suffer substantial damage to the real property by Defendants invading and contaminating the pipes, appurtenances, filters, and fixtures on Plaintiffs' real property with PFAS.

94.    Due to the ongoing and continuing trespass, Plaintiffs have suffered and continue to suffer substantial damage to the personal property by Defendants invading and contaminating the pipes, appurtenances, filters, fixtures on Plaintiffs' personal property, and Plaintiffs' drinking water with PFAS.

95.    As a direct and proximate result of Defendants' contamination of Plaintiffs' water supply, Talladega and Shelby Counties have been damaged, including, but not limited to, past and future monitoring and testing expenses, lost revenues and profits, and expenses in remediating,

96.    Plaintiffs are not seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam that contains PFAS.

## COUNT ONE

### Negligence

97.    Plaintiffs incorporate all prior paragraphs by reference as if fully set forth herein.

98.    Defendants owed a duty to Plaintiffs to exercise due and reasonable care in their distribution, sales, manufacturing, disposal, and other operations to prevent the contamination of PFAS into the water supply.

99.    As described herein, Defendants breached duties owed to Plaintiffs. Under the circumstances, Defendants' breaches constitute negligent, willful, and/or reckless conduct. Defendants' conduct, practices, actions, and inactions combined and concurred to harm Plaintiffs, and as a result Plaintiffs have incurred expenses and will incur reasonably ascertainable expenditures in the future.

WHEREFORE, Plaintiffs demand judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT TWO

### Public Nuisance

100.    Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

101.    Plaintiffs, Shelby County, Alabama and Talladega County, Alabama, own and occupy property used to serve their water customers, including a water treatment plant, water distribution system, and offices.

102.    Defendants have created a nuisance by failing to prevent the contamination of PFAS into the waters throughout the State of Alabama, which has caused contamination of the Plaintiffs' water supply, thereby causing Plaintiffs hurt, inconvenience, and harm.

103.    The specific damages incurred by Plaintiffs include, but are not limited to, expenses associated with the future installation and operation of a filtration system capable of removing Defendants' chemicals from the water; expenses incurred to monitor PFAS contamination levels; expenses incurred to purchase water from any other water system; expenses to properly dispose of PFAS removed from drinking water; and lost profits and sales.  These special damages are unique to drinking water treatment providers like Plaintiffs.

104.    In addition to the special damages sustained by Plaintiffs, the levels of toxic chemical contamination found in the Plaintiffs' water supply, directly caused by Defendants' combined and concurring conduct, have created a condition that threatens the health and well-being of Plaintiffs' customers.

105.    It was reasonably foreseeable, and in fact known to Defendants, that their actions would place, and have placed, the Plaintiff at risk of harm.  The nuisance has caused substantial damages and will continue to cause damages until it is satisfactorily abated.

WHEREFORE, Plaintiffs demand judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT THREE

### Private Nuisance

106.    Plaintiffs re-alleges all prior paragraphs as if set forth fully herein.

107.    Defendants have created a nuisance by their failure to prevent the contamination of PFAS into the public waters throughout the State of Alabama including the Plaintiffs' water supply, thereby causing Plaintiffs hurt, inconvenience, and harm.

108.    The contamination of the water at Plaintiffs' intake sites constitutes a private nuisance depriving Plaintiffs of the ability to deliver clean and uncontaminated water to their customers.

109.    It was reasonably foreseeable, and in fact known to Defendants, that their actions would combine and concur to contaminate, and have contaminated, the water at Plaintiffs' intake sites.  The nuisance has caused substantial damage and will continue to cause damages until it is satisfactorily abated.

110.    WHEREFORE, Plaintiffs demand judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT FOUR

### Trespass

111.    Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

112.    Plaintiffs own and occupy property used to serve their water customers, including water treatment plants, water distribution system, and offices.

113.    Plaintiffs produce and sell personal property to their customers in the form of finished drinking water.

114.   Defendants' intentional acts in failing to contain the release of PFAS knowing that they would contaminate water supplies, caused an invasion of Plaintiffs' real and personal property by Defendants' chemicals, which has affected and is affecting Plaintiffs' interest in the exclusive possession of its property.

115.   Plaintiffs did not consent to the invasion of their property by Defendants' chemicals.

116.   Defendants knew or should have known that their PFAS would contaminate the water supply and result in an invasion of Plaintiffs' possessory interest in their property.

117.   Defendants' trespass is continuing.

118.   Defendants' continuing trespass has impaired Plaintiffs' use of real and personal property and has caused substantial damages by diminishing its value.

WHEREFORE, Plaintiffs demand judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT FIVE

### Wantonness and Punitive Damages

119.   Plaintiffs re-allege all prior paragraphs as if restated herein.

120.   Defendants owed a duty to Plaintiffs to exercise due and reasonable care in their manufacture, distribution, supply, and use of PFAS and to prevent the release of PFAS into the water supply.

121.   In breaching the duties described above, Defendants acted in a wanton, willful, and reckless manner.

122.    Defendants knew or should have known the danger to Plaintiffs created by Defendants' conduct, practices, actions, and inactions.

123.    Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on the Plaintiffs.

124.    Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard of the known risk of harm to the Plaintiffs.

125.    Defendants' conduct, practices, and inactions combined and concurred to harm Plaintiffs.

WHEREFORE, Plaintiffs demand judgment for punitive damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT SIX

### Injunctive Relief

126.    Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

127.    Plaintiffs request that this Court enter an Order enjoining Defendants from continuing the conduct described above and requiring Defendants to take all steps necessary to remove their chemicals from Plaintiffs' water supplies and property.

128.    There is continuing irreparable injury to Plaintiffs if an injunction does not issue, as Defendants' chemicals in the water supply pose a continuing threat to Plaintiffs' property interests, and there is no adequate remedy at law.

WHEREFORE, Plaintiffs demand injunctive relief against all Defendants, jointly and severally, requiring Defendants to remove their chemicals from Plaintiffs' water system and to prevent these chemicals from continuing to contaminate Plaintiffs' water supply.

## **RELIEF DEMANDED**

Wherefore, Plaintiff respectfully requests this Court grant the following relief:

a) Award Plaintiffs damages in an amount to be determined by a jury sufficient to compensate it for removing PFAS from Plaintiffs' drinking water, disposing of PFAS removed from Plaintiffs' drinking water, real property damage, out of pocket expenses, lost profits and sales, and future expenses.

b) Issue an injunction requiring Defendants to remove their chemicals from Plaintiffs' water supply and to prevent these chemicals from continuing to contaminate Plaintiffs' water supply.

c) Award attorney fees and costs and expenses incurred in connection with the litigation of this matter.

d) Award such other and further relief as this Court may deem just, proper, and equitable.

## **JURY DEMAND**

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

Respectfully submitted this 10th day of April, 2023,

/s/ Rhon E. Jones_____
Rhon E. Jones

**OF COUNSEL:**
Rhon E. Jones (JON093)
Rhon.Jones@BeasleyAllen.com
Matthew R. Griffith (GRI085)
Matt.Griffith@BeasleyAllen.com

25

Richard D. Stratton (STR021)
Rick.Stratton@BeasleyAllen.com
David L. Diab (DIA016)
David.Diab@BeasleyAllen.com
Jeffrey D. Price (PRI086)
Jeff.Price@BeasleyAllen.com
Gavin F. King (KIN099)
Gavin.King@BeasleyAllen.com
Elizabeth G. Weyerman (WEY001)
Elizabeth.Weyerman@BeasleyAllen.com
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Post Office Box 4160
Montgomery, AL 36103-4160
Telephone: (334) 269-2343
Facsimile (334) 954-7555